408 S.E.2d 668

**Gregory PARSONS, Plaintiff Below, Appellee,**

v.

**NORFOLK AND WESTERN RAILWAY COMPANY, a Corporation, Defendant Below, Appellant.**

**No. 19789.**

Supreme Court of Appeals of West Virginia.

Submitted May 7, 1991.

Decided July 25, 1991.

Rehearing Denied Sept. 5, 1991.

---

10.  All of the motions by the appellant before Judge Henry were *granted.*

Jay T. McCamic, McCamic & McCamic, Wheeling, and Gregory A. Tobin, Pratt & Callis, East Alton, Ill., for appellee.

Cathy M. Armstrong, O'Brien, Cassidy & Gallagher, Wheeling, and G. Daniel Carney, Thorp, Reed & Armstrong, Pittsburgh, Pa., for appellant.

PER CURIAM:

The plaintiff, Gregory Parsons, suffered a rupture of a Meckel's Diverticulum on his small intestine while employed by the defendant, Norfolk and Western Railway Company (N & W). After undergoing surgery to repair the rupture, the plaintiff filed suit against his employer pursuant to the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 et seq., claiming he suffered permanent disability and a loss of income ranging from $494,452 to $771,650 as a result of injuries caused by N & W's negligence during the course of his employment.

The plaintiff worked as a trackman, machine helper, and machine operator for N & W from 1977 to 1987. He alleges that on August 31, 1987, he strained himself while attempting to throw a defective switch, resulting in a ruptured intestine. In its defense, N & W argued at trial that the plaintiff's pre-existing disease, Meckel's Diverticulitis, caused the rupture, and not the act of throwing the switch.

On October 31, 1989, the jury rendered a verdict in the amount of $800,000 in the plaintiff's favor. N & W now appeals from the final order of the Circuit Court of Brooke County, asserting that the lower court committed numerous errors which require either the reversal of the lower court judgment or a new trial. However, we find no reversible error and therefore affirm the final order entered by the Circuit Court of Brooke County.

█ In their major assignment of error in this appeal, N & W argues that the lower court erred when it excluded portions of the testimony of two of N & W's expert witnesses, Drs. Watson and Srodes. Prior to trial, on May 23, 1989, the court below held a scheduling conference and ordered that the defendant's experts be identified and depositions taken within sixty days. In spite of N & W's failure to comply with this discovery order, at a pre-trial conference on October 2, 1989, N & W asked that the court allow them additional expert witnesses because, during a videotaped trial deposition taken on September 27, 1989, the plaintiff's treating physician, Dr. Emerson, had stated that the plaintiff was permanently disabled from all gainful employment as a result of psychological impairment. N & W claimed that it was surprised by this new testimony. According to N & W, Drs. Watson and Srodes would present expert testimony on causation "with the intent of refuting the opinions rendered by [the plaintiff's] experts."

In an order entered October 3, 1989, the trial court ruled that N & W could proceed with additional discovery regarding the contentions that the plaintiff was totally disabled:

> Defendant moved for leave to engage in additional discovery regarding the Plaintiff's contention that he is *totally* disabled by virtue of psychological difficulties as per the opinion of Plaintiff's expert, Dr. Emerson. Since this is a new development in the claim, the Court granted said Motion. If Plaintiff deems additional discovery or deposition necessary on Defendant's additional discovery, the Court grants Plaintiff leave to proceed.

N & W's experts, Dr. Kerns, Dr. Srodes, and Dr. Watson, were deposed on October 20, 1989, and Dr. Rodman was deposed on October 25, 1989. The plaintiff subsequently made a motion to exclude the testimony of Kerns, Srodes, Watson, and Rodman, while N & W moved to exclude the testimony of two of the plaintiff's experts, Dr. Ford, a surgeon, and Stan Smith, an economist. The court heard discussion of these motions on October 25, 1989, and took the matter under advisement.

Unfortunately, what happened next is somewhat unclear from the incomplete record that is now before us. However, in a letter to this Court dated May 29, 1991,

the plaintiff's counsel explained that on October 26, 1989, the day the trial began:

> ... during a conference in chambers that was *not on the record*, [the trial court] ruled that defendant's witnesses, Dr. Kerns, Dr. Rodman, and portions of Dr. Watson's testimony would be permitted to be presented to the jury ... Dr. Srodes' testimony was excluded as he did not speak to the issue of permanency in his deposition, [that] being the sole reason for allowing his deposition to be taken ... The court also excluded the plaintiff's expert[s], Dr. Ford and Stan Smith entirely.

The plaintiff maintains that "the trial court excluded only those opinions [of Drs. Watson and Srodes] which covered matters other than permanency." [1]

N & W's argument on this point centers around the fact that plaintiff's counsel referred to a portion of Dr. Watson's deposition testimony during cross-examination of another N & W expert. Plaintiff's counsel states that during cross-examination of Dr. Rodman, N & W's expert pathologist, he "was attempting to make the obvious point that not all people that have a Meckel's diverticulum get diverticulitis and that not all people that get diverticulitis get a rupture."

> Q. Well, let me ask you this. You said two percent of the population has a Meckel's diverticulum?
>
> A. Right.
>
> Q. And you have said, what, one-third of those people then go on to diverticulitis or the inflammation?
>
> A. I think that's correct.
>
> Q. So, I have done a little math here. If we do two percent of the population of this country, which is around 250,-000,000 that would come to 5,000,000 people with Meckel's diverticulum. Does that sound right?
>
> A. It sounds right, yes.

> Q. Okay. Then if we take one-third of that what do we have left, about a million and a third people that go to diverticulitis?
>
> A. That's what that would come out to be, yes.
>
> Q. Okay. And you're a pathologist at a big university hospital and you've only seen two or three cases—
>
> A. A middle-size university hospital.
>
> Q. Okay. You have seen two or three cases of diverticulitis?
>
> A. Myself, yes.
>
> Q. Okay. Were you aware, doctor, that *another expert in this case who's with the University of Pittsburgh, a professor there, Dr. Charles Watson, has additionally treated he says dozens of patients with diverticulitis and that to his knowledge none of them have gone on to rupture?*
>
> A. I am not aware of that, no, sir.

(Emphasis added.)

After Dr. Rodman completed his testimony, N & W's counsel made the following motion:

> Your Honor, we have one other issue. During the cross-examination of this witness, Mr. Jones referred to a portion of Dr. Watson's deposition that is on causation and we were not permitted to put it in. We would now ask for permission to put it in since he has opened that door. He's put a part of Dr. Watson's testimony in where he talked about the number of cases of diverticulitis and we have not had an opportunity to let the jury see Dr. Watson's full opinion on causation and the effects of that.

The plaintiff's counsel remarked that, "he didn't ask him anything about causation." The court then ruled: "He didn't ask him an opinion, so your motion is denied."

N & W argues that by permitting plaintiff's counsel to refer to a portion of Dr. Watson's testimony, "the court allowed

---

1. In a letter to this Court dated July 19, 1991, N & W's counsel stated that, "[t]he trial court excluded the causation testimony of Dr. Charles Watson and Dr. Charles Srodes at an off-the-record conference on October 26, 1989 ... There was some discussion on the record con-cerning these experts on October 25, 1989 ... However, there are no record rulings or findings by the court which excluded completely the testimony of Dr. Srodes and limited the testimony of Dr. Watson to certain opinions concerning permanency of plaintiff's medical condition."

[the plaintiff] to introduce evidence for a purpose for which it had previously been declared inadmissible by the trial court...." To counter this argument, the plaintiff states that "defendant in its case-in-chief proffered the testimony of Drs. Watson and Srodes. The court simply allowed the corresponding portions of the cross-examination to follow direct examination." The plaintiff also points out that, "the portion of Dr. Watson's testimony used by Mr. Jones in cross-examination of Dr. Rodman was taken from that testimony of Dr. Watson that was declared admissible by the court and was actually admitted in evidence during the trial!" Indeed, the record indicates that under cross-examination by the plaintiff's counsel, Dr. Watson responded as follows:

Q. Did you tell us how many patients you have treated that have ruptured Meckel's diverticulum?

A. Well, a ruptured Meckel's diverticulum is extremely rare, but Meckel's diverticulitis is not so rare, and I have taken care of a dozen or so such patients.

Q. That have perforated?

A. No, that have Meckel's diverticulitis.

Q. How many have you treated that have perforated?

A. I have not treated anybody with a perforated Meckel's diverticulitis. As I say, that is an extremely rare condition.

Counsel for the plaintiff argues that the cross-examination of Dr. Rodman was confined to matters which were already in evidence. We agree that plaintiff's counsel's reference to Dr. Watson's statement merely brought Dr. Watson's previously expressed opinion to Dr. Rodman's attention.

Addressing the use of depositions in court proceedings, Rule 32(a)(4) of the West Virginia Rules of Civil Procedure states that "[i]f only part of a deposition is offered in evidence by a party, an adverse party may require him to introduce any other parts which ought in fairness to be considered with the part introduced, and any party may introduce any other parts."

In this case, after N & W's initial violation of the discovery order, the trial court was certainly under no obligation to grant N & W's motion to permit them the time to prepare additional experts to meet the "surprise" testimony of the plaintiff's treating physician. Nonetheless, such motion was granted. In light of this consideration, we find no unfairness or abuse of discretion in the fact that the trial court subsequently limited the scope of the testimony that N & W was able to put into evidence. Consequently, we find no reversible error on this point.

■ Next, N & W argues that the trial court committed reversible error because it failed to instruct the jury on the reduction of damages due to the plaintiff's pre-existing condition. The jury was given the following instruction, which was proffered by the plaintiff and concerned the possibility that the plaintiff suffered from a pre-existing condition:

The Court instructs the jury that under the law of this State a Defendant takes the Plaintiff as he finds him. You are therefore accordingly instructed that if you believe from a preponderance of the evidence that the Plaintiff was in a peculiarly weakened condition as a result of a birth defect, prior illness, or prior injury at the time of the accident in question, that it is no defense for the Defendant that the Plaintiff would not have been injured had he been a normal person, as a Defendant is liable for all injury which you believe from a preponderance of the evidence the Plaintiff suffered as a result, in whole or in part, from the Defendant's negligence, if any.

To support their proposed jury instructions, N & W argues that under FELA, a railroad is not responsible for injury sustained as a result of any cause not associated with employment by the railroad. However, this point was adequately conveyed by the following instruction, which was submitted by defense counsel and read to the jury after the above-quoted plaintiff's instruction:

If you find that the Plaintiff's Meckel's Diverticulum was diseased and you find

that no action or inaction of the Defendant was a cause of this disease, or aggravated this disease, then you must find the Defendant not liable for the Plaintiff's injuries.

As we noted above, it was defense counsel who offered this instruction, stating:

*[W]e have no objection* with the legal proposition that you take a Plaintiff as you find him, but I think that needs to be clarified with the corresponding principle that if his pre-existing situation is the complete cause of his problem that the Defendant isn't responsible. (Emphasis added.)

Thus, N & W was permitted the instruction it requested on this point. In syllabus point 3 of *State v. Gangwer*, 169 W.Va. 177, 286 S.E.2d 389 (1982), this Court recognized that "[t]he general rule is that a party may not assign as error the giving of an instruction unless he objects, stating distinctly the matters to which he objects and the grounds of his objection." In this case, N & W did not raise any objections to the instructions as they were given. Therefore, we find no reversible error.

N & W also argues that the lower court committed reversible error when it permitted the jury to reconsider its answers to the following special interrogatories:

No. 1  Was the Defendant negligent?
Answer: Yes
No. 2  Did the negligence of the Defendant cause in whole or in part the Plaintiff's injuries?
Answer: Yes
No. 3  Was the Plaintiff negligent in such manner as to cause his own injuries in whole or in part?
Answer: No
No. 4  We hereby assess fault for the Plaintiff's injuries as follows:
Norfolk & Western Railway Company 80%
Gregory Parsons  20%

The answers to the third and fourth interrogatories were obviously inconsistent. After briefly discussing the matter with counsel, the court resubmitted the interrogatories to the jury:

Members of the jury, I know that the verdict form is a little confusing, but I would like for you to go back to the jury room and reread page two and remember that I gave you that one typo correction on the one copy of the verdict form that I left with you, and see if you still want to leave this whole thing the way it is. Just read each interrogatory and read the instructions that are given after each interrogatory, and then come back and let me know whether you still want to stay with this the way it is or whether you want to change anything.

When the jury returned, it assessed N & W with 100% of the fault for the plaintiffs' injuries. The court's decision to send the jury back to the jury room to reconsider its answers is consistent with the direction found in Rule 49(b) of the West Virginia Rules of Civil Procedure, which provides, in part:

When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, the court shall not direct the entry of judgment but may return the jury for further consideration of its answers and verdict or may order a new trial.

As we would expect, N & W suggests that "the better course of action in this case would have been to order a new trial." However, there is no evidence to suggest that the jury was confused when it was returned to the jury room to reconsider its responses to the interrogatories. In fact, when questioned by the court after returning with the form which assessed N & W with 100% liability, the jury foreman stated that on the initial interrogatories, "when I wrote that I thought I had done that wrong. That was just a mistake on my part." We find no reversible error on this point.

N & W also alleges that several errors were made in the plaintiff's closing argument in this case. First, citing *Stillman v. Norfolk & Western Ry. Co.*, 811 F.2d 834 (4th Cir.1987), and *Kodack v. Long Island R. Co.*, 342 F.2d 244 (1965), N

& W argues that the trial court committed reversible error by allowing the plaintiff to state during closing argument that a lawsuit brought pursuant to FELA was his only means of recovery. Specifically, plaintiff's counsel stated, "[y]ou should also know that [the plaintiff] is covered by the Federal Employers Liability Act and this suit was brought pursuant to that act. It's a federal act. That's his only means of recovery. He has no other means of recovery." When defense counsel expressed his disapproval with this statement, the court cautioned plaintiff's counsel, "[w]ell, as long as you don't go any further on that point."

In *Stillman,* no improper comments were actually made to the jury, but the court rejected plaintiff's counsel's argument that the district court should have permitted him to inform the jury that recovery under FELA was the plaintiff's only possible remedy and that he would receive no workers' compensation benefits. The court found the argument unpersuasive: "Stillman's ineligibility for workers' compensation benefits was completely irrelevant to the issues presented in this case, and allowing the jury to consider such information could have prejudiced the Railroad." *Id.* at 838.

Counsel in *Kodack* made the following remark in his opening statement to the jury: "At the very outset I desire that you know that Harold Kodack brings this action against Long Island Rail Road Company under the Federal Employers Liability Act. He has no compensation rights." *Kodack,* 342 F.2d at 247. On appeal, the court concluded that "although it was inexcusable for Kodack's experienced trial counsel to make such a remark to the jury, the remark itself was not so prejudicial under the circumstances as to justify a reversal." *Id.*

Likewise, we find that counsel's remark in this case was not prejudicial so as to warrant a reversal, particularly in light of the fact that the court admonished counsel to refrain from any further remarks and there was never any mention made of workers' compensation benefits. "[A] trial court has broad discretion in controlling argument before the jury...." *Dawson v. Casey,* 178 W.Va. 717, 364 S.E.2d 43, 47 (1987).

■ N & W also contends that plaintiff's counsel committed reversible error when he requested a sum certain in his closing argument to the jury. In his summation, plaintiff's counsel stated that, "[a]t the close of all of the evidence, based on [the plaintiff's] lost wages, his pain and suffering, and the other elements of damages, I'm going to ask you to return a verdict for $1.3 million dollars." In his rebuttal, he reiterated to the jury that "I think ... a jury verdict of $1.3 million is warranted under the evidence." Defense counsel did not raise an objection to plaintiff's remarks on either occasion. In syllabus point 3 of *State v. Jennings,* 178 W.Va. 365, 359 S.E.2d 593 (1987), this Court stated that " ' "[f]ailure to make timely and proper objection to remarks of counsel made in the presence of the jury, during the trial of a case, constitutes a waiver of the right to raise the question thereafter either in the trial court or in the appellate court." Point 6, syllabus, *Yuncke v. Welker,* 128 W.Va. 299 [36 S.E.2d 410].' Syllabus point 7, *State v. Cirullo,* 142 W.Va. 56, 93 S.E.2d 526 (1956)."

■ Finally, N & W argues that the trial court committed reversible error when it denied N & W's motion for a directed verdict. N & W claims that the plaintiff failed to prove that N & W was negligent.[2] "[T]he plaintiff in [a] FELA case can get to the jury with even slight evidence of negligence." *Lancaster v. Norfolk and Western Ry. Co.,* 773 F.2d 807 (1985), citing *Rogers v. Missouri Pacific Railroad Co.,*

---

**2.** The United States Supreme Court has defined negligence within the context of a FELA action as follows:

[N]egligence, within the meaning of the Federal Employers' Liability Act, attache[s] if [the employer] "knew, or by the exercise of due

care should have known," that prevalent standards of conduct were inadequate to protect petitioner and similarly situated employees. *Urie v. Thompson,* 337 U.S. 163, 178, 69 S.Ct. 1018, 1028, 93 L.Ed. 1282, 1297 (1949).

352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957); *Heater v. Chesapeake & Ohio Ry. Co.*, 497 F.2d 1243, 1246–47 (7th Cir.1974); *Mendoza v. Southern Pacific Transp. Co.*, 733 F.2d 631, 632–33 (9th Cir.1984). In this case, the plaintiff states that the central issue with regard to N & W's alleged negligence dealt with whether the switch thrown by the plaintiff was defective. The plaintiff presented testimony from numerous witnesses who indicated that the switch was defective. Thus, we conclude that the evidence presented was sufficient to overcome N & W's motion for a directed verdict and send the case to the jury for determination.

For the foregoing reasons, the judgment of the Circuit Court of Brooke County is affirmed.

Affirmed.